# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INTERMUNE, INC., and ROCHE HOLDINGS, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2021-0694-NAC |
| W. SCOTT HARKONEN, M.D., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 3, 2023
Date Decided: May 10, 2023

Karen A. Jacobs, Megan W. Cascio, Courtney Kurz, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Laurie Carr Mims, Benjamin D. Rothstein, Candice Mai Khanh Nguyen, Melissa Cornell, Catherine C. Porto, KEKER, VAN NEST & PETERS LLP, San Francisco, California; *Counsel for Plaintiffs InterMune, Inc., and Roche Holdings, Inc*.

Michael A. Weidinger, Megan Ix Brison, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; Elizabeth Sandza, Richard W. Sandza, SANDZA LAW, PLLC, Washington, District of Columbia; *Counsel for Defendant W. Scott Harkonen, M.D*.

**COOK, V.C.**

Defendant Dr. W. Scott Harkonen is the founder and former CEO of InterMune, Inc. (the "Company"). In 2009, Harkonen was convicted of wire fraud. A federal jury found beyond a reasonable doubt that Harkonen acted with an intent to defraud when he directed the Company to issue a false and misleading press release about the results of one of the Company's clinical trials.

Harkonen litigated the validity of his conviction for over nine years. He challenged the evidence of his intent after trial, on appeal, collaterally, and in the Supreme Court of the United States. Top-tier lawyers advocated for him in every challenge and provided constitutionally effective assistance. Every challenge failed.

Having exhausted judicial avenues for overturning his conviction, Harkonen sought clemency from the President of the United States. In 2021, then-President Trump pardoned Harkonen's conviction. The pardon did not expunge Harkonen's conviction or declare him innocent of wire fraud. Instead, the pardon restored the basic civil rights that any federal felony conviction removes.

The Company and its insurers advanced Harkonen's defense costs. After Harkonen was convicted, the insurers invoked a policy exclusion for crimes involving intentional fraud to seek repayment from the Company of a portion of the sums they had advanced. During arbitration, the Company argued that Harkonen's conduct did not fit the plain language of the exclusion. The arbitrators rejected the Company's argument and ordered the Company to repay the insurers.

Through this action, the Company seeks a declaration that Harkonen is not entitled to indemnification. The parties have cross moved for summary judgment on two questions of law. The first is whether, under Section 145(c) of the Delaware General Corporation Law, a presidential pardon renders a corporate officer "successful on the merits or otherwise." The second is whether a corporate officer who has been convicted of federal wire fraud may relitigate the issue of "good faith" under Section 145(a) when the guilty verdict necessarily determined that the officer acted in bad faith and the officer had a full and fair opportunity to challenge the verdict. The answer to both questions is no.

Under Section 145(c), a successful outcome in a criminal action is anything other than a conviction. Harkonen was convicted. So he was not successful.

A presidential pardon does not erase the conviction or operate as a determination of innocence. Harkonen's pardon explains that.

To redefine success, Harkonen argues that the pardon restored his civil rights. He says Section 145(c) indemnification was a "basic civil right" eliminated by his conviction such that denying him indemnification would impermissibly punish him for a pardoned crime. Corporate indemnification is indeed important, but it is not a basic civil right. Basic civil rights are fundamental rights. Indemnification offered to corporate officials under a state statute is not a right that belongs to every United States citizen.

Even so, the basic civil rights maneuver stumbles over Section 145(c)'s text. Section 145(c) indemnification is not unconditional; it depends on success. A conviction is not success. And the pardon did not overturn Harkonen's conviction. So even if, somehow, corporate officer indemnification qualified as a basic civil right restored by a federal pardon, Harkonen never lost it because he never had it.

Harkonen's Section 145(a) arguments fare no better. The Company chose to treat as mandatory the permissive indemnification provided under Section 145(a). But that choice did not modify the statute. An officer is not entitled to indemnification under Section 145(a) unless the officer acted in good faith. Bad faith is an element of wire fraud. A jury found Harkonen guilty of wire fraud. Multiple courts affirmed. And the pardon did not vacate any of the judgments. Precedent explains that a conviction based on bad faith is conclusive evidence of a failure to act in good faith. So Harkonen cannot litigate his state of mind anymore.

To undermine the preclusive effect of his conviction, Harkonen raises a number of issues that, according to him, render his conviction infirm. He contends, for example, that after he was convicted, the Supreme Court of the United States validated the statistical methods he used to reach the conclusions in the press release that were found fraudulent. But this argument—and all the others—were already considered and rejected during Harkonen's criminal proceedings. Were Harkonen to reassert those arguments in federal court today, they would be procedurally barred

3

under post-conviction rules. The indemnification phase of a Section 145 proceeding is not a means of collateral attack. The General Assembly did not enact Section 145 to give directors and officers of Delaware corporations an additional vehicle for post-conviction review.

Harkonen alternatively invokes the judicial admissions doctrine. He insists that because the Company told arbitrators he did not act with an intent to defraud, the Company cannot now argue that he acted in bad faith. But the Company's argument was, if anything, an interpretation of its insurance contracts. The judicial admissions doctrine does not apply to legal arguments.

Harkonen's position also overlooks that Section 145 prohibits a Delaware corporation from indemnifying bad faith conduct. The Company cannot "admit" that, despite a conviction conclusively establishing that he acted in bad faith, Harkonen is entitled to indemnification under Section 145(a).

Harkonen's motion for summary judgment is therefore denied. The Company's cross motion for summary judgment is granted.

# I.    FACTUAL BACKGROUND

The material facts are undisputed or are not subject to reasonable dispute.[1]

## A.    The Parties

The Company is a Delaware corporation that commercializes drug treatments. Harkonen served as the Company's CEO from 1998 until 2003. Plaintiff Roche Holdings, Inc. acquired the Company and, through the merger agreement, agreed to honor the Company's indemnification obligations.[2]

## B.    The Criminal Proceedings

In 2002, the Company issued a press release. The press release announced the results of a clinical trial that the Company conducted on one of its drug products, "Actimmune." According to the press release, the clinical study's results showed

---

[1] Citations in the form of "PX [] —" refer to the exhibits attached to the Transmittal Affidavit in Support of Plaintiffs' Motion for Partial Summary Judgment. *See* Dkt. 95. Citations in the form of "DX [] —" refer to the exhibits attached to the Transmittal Affidavit in Support of Defendant's Motion for Partial Summary Judgment. *See* Dkt. 96. Citations in the form of "Tr. —" refer to the transcript of the hearing on the parties' motions. *See* Dkt. 137. Where appropriate, I have taken judicial notice of the decisions and filings in Harkonen's criminal proceedings, his collateral challenges to those proceedings, and the insurance arbitrations. *See* D.R.E. 201(b)(2), (c)–(d), 202(a)(1). Relevant decisions include *United States v. Harkonen*, 2009 WL 1578712 (N.D. Cal. June 4, 2009) (*Harkonen I*); *United States v. Harkonen*, 2010 WL 2985257 (N.D. Cal. July 27, 2010) (*Harkonen II*); *United States v. Harkonen*, 2011 WL 13250647 (N.D. Cal. Apr. 18, 2011) (*Harkonen III*); *United States v. Harkonen*, 510 F. App'x 633 (9th Cir. 2013) (*Harkonen IV*), *cert. denied*, 571 U.S. 1110 (2013); *United States v. Harkonen*, 2015 WL 4999698 (N.D. Cal. Aug. 21, 2015) (*Harkonen V*), *aff'd*, 705 F. App'x 606 (9th Cir. 2017) (*Harkonen VI*), *cert. denied*, 139 S. Ct. 467 (2018).

[2] Dkt. 1 ¶ 28 (Compl.). For this reason, this decision's references to the Company should be understood, where contextually appropriate, to include Roche.

that Actimmune significantly reduced mortality rates associated with idiopathic pulmonary fibrosis ("IPF").  As Harkonen touted in the press release:

> We are extremely pleased with [the clinical study's] results, which indicate Actimmune may extend the lives of patients suffering from [IPF] . . . . Actimmune is the only available treatment to have clinical benefit in IPF, with improved survival data . . . .[3]

In reality, "overwhelming, undisputed evidence" showed that the clinical study "was a failure."[4]  The clinical study did not meet its endpoints.  The press release flatly misrepresented the results of the clinical study.

Harkonen was the brains behind the press release and the lead drafter of its contents.  So federal prosecutors charged him with one count of wire fraud.[5]  The government alleged that Harkonen "falsely portrayed the results" of the press release.[6]  The government further alleged that Harkonen directed the issuance of the press release with the intent to defraud.[7]

---

[3] DX B (Press Release).

[4] *Harkonen II*, 2010 WL 2985257, at *10.

[5] Harkonen also was charged with mislabeling in violation of the Federal Food, Drug & Cosmetic Act.  *See generally* 21 U.S.C. §§ 331(k), 333(a)(2), 352(a).  Harkonen was acquitted of that charge.  Because the parties have not dilated on the effect of the acquittal on any sums advanced to Harkonen, this decision does not discuss it.

[6] DX A ¶ 26 (Indictment).

[7] *Id.* ¶¶ 22–25.

Harkonen assembled a defense team comprising counsel from prestigious law firms and a now-sitting Judge of the Superior Court of California.[8] His team unsuccessfully moved to dismiss the indictment for failure to support the element of intent.[9] Then the case was tried before a jury in the United States District Court for the Northern District of California.

Trial lasted six weeks. The government sought to prove that the results in the press release were false and misleading because they were not derived from the original clinical study data, but rather from Harkonen's *post hoc* manipulations.[10] The evidence included testimony from Company insiders who were present when Harkonen reworked the clinical study data and created the press release. The defense team "amply" cross-examined all the government's witnesses.[11]

After the parties rested, the district court instructed the jury on the elements of wire fraud. The district court explained that Harkonen could not be found guilty of wire fraud unless the government proved beyond a reasonable doubt that he "(i) made at least one false or fraudulent statement; (ii) knew the statement(s) were false or fraudulent[;] and (iii) acted with an intent to defraud."[12]

---

[8] *Harkonen V*, 2015 WL 4999698, at *2.

[9] *See Harkonen I*, 2009 WL 1578712

[10] *See Harkonen II*, 2010 WL 2985257, at *3–17 (detailing the trial evidence).

[11] *Harkonen III*, 2011 WL 13250647, at *8 (denying Harkonen's motion for a new trial).

[12] *Harkonen II*, 2010 WL 2985257, *3 (enumeration modified) (quoting jury instructions).

On September 29, 2009, the jury found Harkonen guilty of wire fraud. The government advocated for a 10-year prison sentence. The district court sentenced Harkonen to probation and ordered him to pay a fine.

## C. The Challenges To The Conviction

Harkonen spent nine years challenging his conviction. From 2009 through 2018, he used seven different vehicles to contest the evidence supporting his intent: a motion for acquittal, a motion for a new trial, a direct appeal, a petition for a writ of error *coram nobis*, a collateral appeal, and two petitions for a writ of *certiorari*.

### 1. The Acquittal Motion

Harkonen first moved for acquittal. He argued that the government failed to prove fraudulent intent beyond a reasonable doubt. But the district court disagreed. In denying the motion, the district court described the evidence of Harkonen's guilt as not only "sufficient," but also as "overwhelming" and "convincing."[13]

### 2. The New Trial Motion

Harkonen next moved for a new trial based on a government *amicus* brief filed in *Matrixx Initiatives, Inc. v. Siracusano*.[14] The question presented in *Matrixx* was whether a plaintiff can satisfy the materiality element of a securities fraud claim based on a pharmaceutical company's failure to disclose reports of adverse events

---

[13] *See Harkonen II*, 2010 WL 2985257, at \*10, \*12–14.

[14] 563 U.S. 27 (2011).

associated with a drug when the reports do not suggest a statistically significant number of adverse events. The government's *amicus* brief argued that statistical significance is not the only relevant metric for assessing the materiality of reports on adverse events.[15] The Supreme Court of the United States agreed.[16]

Harkonen claimed the *amicus* brief amounted to "newly discovered evidence."[17] In his view, the prosecution argued that "statistical evidence alone precluded" a finding that there was "a good faith reason to believe Actimmune in fact caused survival benefits."[18] Harkonen contended that the *Matrixx* ruling foreclosed that theory.

The district court denied the motion, finding the *amicus* brief to be "entirely consistent" with Harkonen's prosecution.[19] Harkonen was not convicted for using certain scientific *methods* but rather for materially misrepresenting the *results*:

> [T]he question squarely presented is whether the press release misrepresented the results of the [clinical study] in a material way . . . . If Harkonen had a good faith basis for concluding that Actimmune was an effective treatment for IPF based on a number of factors outside the [clinical study results, he could have made those connections in the [press release] and this would be a very different case . . . . The jury heard substantial evidence that the [clinical study] results did not establish the causal relationship announced in the [press release], that

---

[15] *See Harkonen III*, 2011 WL 13250647, at *3.

[16] *See Matrixx*, 563 U.S. at 40–44.

[17] *Harkonen III*, 2011 WL 13250647, at *8–9.

[18] *Id.*

[19] *Id.* at *9.

9

Harkonen knew this, and nothing in *Matrixx* undermines either of these conclusions.[20]

### 3. The Direct Appeal

Harkonen appealed to the United States Court of Appeals for the Ninth Circuit. He advanced a barrage of arguments, but only three are relevant here. First, he asserted that the evidence did not prove he acted with the intent to defraud. Second, he urged that the jury should have been given a good faith instruction. Third, he reiterated the purportedly exonerating effect of the *Matrixx* decision.

The court of appeals affirmed. As to the sufficiency challenge, the court of appeals found that "nearly everybody actually involved in the [clinical study] testified that the Press Release misrepresented [the clinical study's] results."[21] The court of appeals observed that "even Harkonen himself was 'very apologetic' about the Press Release's misleading nature."[22] That evidence "strongly support[ed] the [jury's] finding that Harkonen had the specific intent to defraud."[23] As the court of appeals observed,

> Harkonen's [*post hoc*] analyses were conducted with fraudulent intent[.] Harkonen stated he would "cut that data and slice it until he got the kind of results he was looking for" .... Given his clear financial incentive to find a positive result in the face of [the clinical study's] failure to meet its pre-determined goals, we conclude the evidence

---

[20] *Id.* (cleaned up).

[21] *Harkonen IV*, 510 F. App'x at 636.

[22] *Id.* (quoting trial testimony).

[23] *Id.*

sufficiently supports the jury's determination that Harkonen had the specific intent to defraud.[24]

The court of appeals next held that a good faith instruction was not required. The court of appeals explained that the instruction would have been superfluous because good faith is addressed by wire fraud's intent to defraud element.[25]

Finally, the court of appeals rejected the *Matrixx* argument. The court of appeals held that *Matrixx* was inapposite because, as the district court explained, "Harkonen's scientific methods were not on trial; the issue was whether he misleadingly presented his analyses in the Press Release."[26]

### 4. The First *Certiorari* Petition

Harkonen petitioned for a writ of *certiorari*. Harkonen contended that the press release was an expression of scientific opinion that cannot give rise to criminal liability.[27] The Supreme Court of the United States denied the petition.

---

[24] *Id.* (cleaned up).

[25] *Id.* at 638.

[26] *Id.*

[27] *See* Pet. for Writ of Cert., *Harkonen v. United States*, 571 U.S. 1110 (2013) (No. 13-180), 2013 WL 4027035, at *15–21.

## 5. The Writ of Error

Harkonen collaterally attacked his conviction with a petition for a writ of error *coram nobis*.[28]  Harkonen argued that he received ineffective assistance of counsel. As support for that position, Harkonen cited his counsel's failure to introduce at trial expert testimony from a biostatistician, Dr. Steven Goodman.  Goodman would have opined on the scientific validity of Harkonen's statistical methods.

The district court denied the petition.  The district court observed that, "throughout all of his proceedings, Harkonen . . . had ample access to assets and counsel, and consistently demonstrated that he was willing and able to apply these resources to challenging his conviction."[29]  The district court also held that the failure to introduce Goodman's testimony at trial did not prejudice the outcome.[30] The district court separately noted that Goodman's testimony *was* introduced, albeit as mitigation evidence at sentencing.[31]

## 6. The Second Appeal

Harkonen appealed again and the court of appeals affirmed again.  The court of appeals held that his *Matrixx* arguments triggered post-conviction procedural bars

---

[28] The writ of error *coram nobis* is a post-conviction device available to convicted persons who are ineligible for *habeas* relief.  Harkonen was ineligible for *habeas* relief because he no longer was in "custody"—*i.e.*, serving probation—at this time.  *See* 28 U.S.C. § 2255(a).

[29] *Harkonen V*, 2015 WL 4999698, at *7.

[30] *Id.* at *8–9.

[31] *Id.* at *9.

on relitigating issues previously decided during the defendant's direct proceedings.[32]
To obtain merits review, the court of appeals required Harkonen to show "a change
in controlling law" or "manifest injustice."[33] Harkonen showed neither. The court
of appeals separately rejected Harkonen's ineffective assistance arguments.

### 7. The Second *Certiorari* Petition

Finally, Harkonen petitioned for *certiorari* again. He argued that, in light of
*Matrixx*, he was "actually innocent."[34] The Supreme Court denied this petition too.

### D. The Insurance Arbitrations

Meanwhile, the Company was in a fight with its insurers, which had paid for
the bulk of the cost of Harkonen's defense.[35] The Company advanced the defense
costs to the extent they exceeded the scope of the insurance coverage.[36] To obtain
the advancements from the Company, Harkonen executed an undertaking to repay
the advancements if he ultimately were found not entitled to indemnification.[37]

---

[32] *See Harkonen VI*, 705 F. App'x at 606.

[33] *Id.* (internal quotation marks omitted).

[34] Pet. for Writ of Cert., *Harkonen v. United States*, 139 S. Ct. 467 (2018) (No. 18-417), 2018 WL 4819016, at *5, *25–29.

[35] *See, e.g.*, Dkt. 1 ¶¶ 79–80 (Compl.).

[36] *Id.* ¶ 80. It appears that Harkonen had multiple avenues for seeking advancement and indemnification. *See* PX G § 43(a), (c) (Bylaws); PX F §§ 2, 8 (Indemnity Agreement). At this stage, the parties have not suggested that this has analytical importance.

[37] PX § H (Undertaking).

After Harkonen's conviction, the insurers sought to claw back a portion of their coverage, citing a policy exclusion for "deliberate criminal or deliberate fraudulent acts." The exclusion provided that:

> The Insurer shall not be liable to make any payment for Loss . . . arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the Insured if a judgment or a final adjudication . . . adverse to the Insured(s) establishes that such deliberate criminal or deliberate fraudulent act was committed.[38]

The Company and Harkonen[39] arbitrated the insurance dispute before two panels. The Company contended that the "phrase deliberate criminal or deliberate fraudulent act" applied only if "Harkonen 'deliberately' set out to commit a crime or fraud, as such."[40] Harkonen reprised the same arguments that he pursued in the federal courts. The Company joined Harkonen in arguing that the press release was "not false or fraudulent, so no criminal [or] fraudulent act was committed at all."[41]

The arbitrators rejected the Company's arguments and ordered repayment. The panels construed the plain language of the policies and determined that a wire fraud conviction fit the definition of "deliberate fraud."[42] One of the panels noted that Harkonen was raising the same challenges the federal courts repeatedly rejected:

---

[38] DX L at 3 (Opp'n Br. to Insurers' Mots. for Partial Summ. J.) ("Arb. Br.").

[39] The parties have not discussed whether Harkonen's insurance-funded advancements were paid directly to him or paid to the Company and then disbursed to him.

[40] PX D at 3 (Arb. Order) (cleaned up) (quoting Arb. Br. at 16).

[41] Ex. A to Dkt. 107 at 43:14–16 (Tr. of Arb. Hr'g).

[42] PX D at 4–6 (Arb. Order); PX E at 4:21–6:14 (Arb. Order).

At the core of [] Harkonen's opposition is his further desire to disregard the judgment against him and relitigate the wire fraud case . . . .

In his post-trial motions . . . and [petition] for writ of error *coram nobis* and his two appeals from the denial of those [filings], [] Harkonen . . . presented the argument[s] he wants to make here four times – six, if denial of a *cert.* petition counts as a loss. The trial judge carefully reviewed the evidence and found sufficient evidence from which the jury could infer that [] Harkonen issued the press release with an intent to defraud.[43]

The arbitrators declined to give the Company "another trial" on facts already proven against Harkonen.[44]

## E.     The Pardon

In 2020, Harkonen applied for a presidential pardon. Harkonen sought a pardon for two principal reasons. First, Harkonen claimed that he was innocent of wire fraud. Second, Harkonen claimed that the loss of his medical license had been preventing him from developing treatments for COVID-19. In Harkonen's words:

[A]lthough the instructions for this application disfavor discussions of innocence, this is the rarest of cases in which events since the guilty verdict at 2009 trial establish that verdict . . . to have been a miscarriage of justice . . . .

I also am seeking this pardon . . . because I wish to end my FDA debarment . . . . [M]y conviction . . . is wholly at odds with the pressing need for emerging therapies that has been so critical to the present battle against COVID-19.[45]

---

[43] PX D at 5 (Arb. Order).

[44] Ex. B to Dkt. 107 at 49:13–17 (Tr. of Arb. Hr'g).

[45] DX I at 13 (Pardon Appl.).

To support his innocence, Harkonen attached a quasi-legal memorandum to his pardon application.[46] The memorandum made all the arguments Harkonen raised during his criminal proceedings.

On January 19, 2021, then-President Trump pardoned Harkonen (the "Pardon.").[47] The Pardon arrived with a letter from the Office of the United States Pardon Attorney. The U.S. Pardon Attorney explained that, although "full and unconditional," the Pardon did not "erase or expunge" Harkonen's conviction or "indicate his innocence." Instead, the Pardon only restored his "basic civil rights."

> A presidential pardon is a sign of forgiveness. It does not erase or expunge the record of conviction and does not indicate innocence . . . .
>
> A presidential pardon restores basic civil rights . . . . You should consult with appropriate state authorities regarding . . . your exercise of such state law rights as voting, serving on a jury, and holding public office, and your eligibility for occupational and professional licenses . . . .[48]

By its own terms, the Pardon did not vacate Harkonen's conviction.

## F. This Litigation

The Company filed this action under Section 145 seeking declarations that Harkonen is not entitled to indemnification for costs relating to his defense against

---

[46] *See* Attach. C to *id.*

[47] *See* DX J (Pardon).

[48] *Id.*

the wire fraud charge for which he was convicted and subsequent proceedings.[49] I denied Harkonen's various pleading-stage motions.[50]

The parties disagreed about the scope of trial. The Company envisioned a trial largely on the paper record produced by the underlying criminal proceedings. Harkonen contended that a trial must include, among other sources of evidence, testimony (live or otherwise) from up to nineteen witnesses who testified during Harkonen's trial about events that occurred twenty-one years ago.[51]

I directed the parties to file cross motions for summary judgment. In doing so, I hewed to Harkonen's early suggestion that most, if not all, the issues in this case could be resolved as a matter of law.[52] The parties' cross motions address two legal issues: (i) whether Harkonen's receipt of the Pardon entitles him to indemnification under Section 145(c); and (ii) whether Harkonen's conviction precludes him from establishing "good faith" under Section 145(a).

## II. LEGAL ANALYSIS

"A ruling on indemnification is appropriate at the summary judgment stage where there are no material factual disputes germane to indemnification and the

---

[49] The Company also asserts a separate claim for reimbursement.

[50] *See* Dkt. 48 at 93:21–119:8 (Tr. of Oral Rulings Den. Def.'s Mot. to Disqualify, Mots. to Dismiss under Ct. Ch. R. 12(b)(2), (4), (5), and Mot. to Dismiss or Stay under Ct. Ch. R. 12(b)(3)).

[51] *See, e.g.*, Dkt. 87 at 19:10–20:1–7, 29–30:9 (Tr. of Hr'g on Scheduling Dispute).

[52] *See* Dkt. 54 at 14:20–15:8 (Tr. of Def.'s Arg. in Opp'n to Pls.' Mot. to Expedite).

moving party is entitled to judgment as a matter of law."[53]  "The moving party bears the initial burden of demonstrating that even with the evidence construed in the light most favorable to the non-moving party there are no genuine issues of material fact."[54]  If that burden is met, the non-moving party "must do more than show there is some metaphysical doubt as to material facts."[55]  Instead, the non-moving party "must affirmatively present evidence—not guesses, innuendo or unreasonable inferences—demonstrating the existence" of a triable issue.[56]  "There is no issue for trial unless if there is sufficient evidence . . . to return a verdict" for the non-movant.[57]

"The fact that the parties have filed cross motions does not alter the [summary judgment] standard."[58]  The Court will grant a cross motion for summary judgment

[53] *Horne v. OptimisCorp*, 2017 WL 838814, at *3 (Del. Ch. Mar. 3, 2017) (cleaned up), *aff'd*, 177 A.3d 69 (Del. 2017) (TABLE).  *See* Ct. Ch. R. 56(c).

[54] *In re Orchard Enters. S'holder Litig.*, 88 A.3d 1, 16 (Del. Ch. 2014) (citing *Brown v. Ocean Drilling & Expl. Co.*, 403 A.2d 1114, 1115 (Del. 1979)).

[55] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) (quoting *Matsushita Indus. Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[56] *Cirillo Fam. Tr. v. Moezinia*, 2018 WL 3388398, at *6 (Del. Ch. July 11, 2018) (internal quotation marks omitted), *aff'd*, 220 A.3d 912 (Del. 2019) (TABLE).  *See* Ct. Ch. R. 56(e).

[57] *Health Sols. Network, LLC v. Grigorov*, 2011 WL 443996, at *2 (Del. Feb. 9, 2011) (ORDER) (alteration omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

[58] *Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *6 (Del. Ch. Dec. 4, 2000).

if "no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[59]

As explained below, Harkonen is not entitled to indemnification under Section 145(c) because he was not successful on the merits or otherwise in defending against the prosecution. And Harkonen is precluded from establishing good faith under Section 145(a) because his conviction is conclusive evidence that he acted in bad faith. The Company's motion is therefore granted and Harkonen's motion is denied.

## A. Indemnification Under Section 145(c)

I begin with Section 145(c). "Section 145(c) allows corporate officials to defend themselves in legal proceedings secure in the knowledge that, *if vindicated,* the corporation will bear the expense of litigation."[60] Put differently, Section 145(c) provides a right to mandatory indemnification that is contingent on "success."

> To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.[61]

---

[59] *Empire of Am. Relocation Servs. v. Com. Credit Corp.*, 551 A.2d 433, 435 (Del. 1988).

[60] *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005) (emphasis added) (internal quotation marks omitted).

[61] 8 *Del. C.* § 145(c)(1).

Due to Section 145(c)'s contingent structure, a "right to indemnification cannot be established . . . *until after* the defense" in the underlying action is complete, because only then can it be determined whether the indemnitee was "successful on the merits or otherwise."[62]

### 1. Harkonen's Conviction Does Not Constitute "Success."

In determining success, the Court "looks strictly at the outcome of the underlying action."[63] Under this framework, the Court eschews a "post hoc, fact-driven analysis" and instead asks whether the official prevailed "in a strictly legal

---

[62] *Tafeen*, 888 A.2d at 211 (emphasis added) (quoting *id.*). A key issue is therefore when the underlying proceeding ends. Although the Company did not raise this point, treating the Pardon as part of Harkonen's criminal proceedings seems debatable. Section 145 provides indemnification for the "defense" of a criminal "action, suit or proceeding." *See* 8 *Del. C.* § 145(a), (c)(1). Assuming a pardon application could be considered "defensive," Harkonen received the Pardon in January 2021—years after his conviction became final and non-appealable. *See Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 397 (Del. Ch. 2008) (Strine, V.C.) (holding that a "final disposition" for Section 145 purposes means a "final, non-appealable conclusion" to the underlying action). Given all this, it is not clear to me that the Pardon should be viewed as part of Harkonen's criminal "action, suit or proceeding." *See Criminal Action*, Black's Law Dictionary (11th ed. 2019) ("an action brought by the government to punish an offense against the public"); *Suit*, Black's Law Dictionary (11th ed. 2019) ("[a]ny proceeding by a party or parties against another in a court"); *Criminal Proceeding*, Black's Law Dictionary (11th ed. 2019) ("A judicial hearing, session, or prosecution in which a court adjudicates whether a person has committed a crime or, having already fixed guilt, decides on the offender's punishment; a criminal hearing or trial."). The Company did not make this argument and conceded that the Pardon could be considered. *See* Tr. at 13:17–23; Dkt. 104 at 14 n.6. This decision therefore expresses no view on how that point of law should be resolved.

[63] *Brown v. Rite Aid Corp.*, 2019 WL 2244738, at *6 (Del. Ch. May 24, 2019) (internal quotation marks omitted).

20

sense[.]"[64] For criminal proceedings, the answer is relatively straightforward. "It is well-settled that, in a criminal proceeding, anything less than a conviction constitutes 'success'" on the merits or otherwise.[65]

Here, Harkonen was convicted of wire fraud. It does not matter "how or why" he was convicted.[66] Nor do the subjective motivations of the prosecutors.[67] Harkonen's conviction alone constitutes failure.

Harkonen concedes that "the outcome of the underlying proceeding" is dispositive.[68] That should be the end of the matter. Recognizing this, Harkonen tries to redefine success using the Pardon. But the Pardon does not change anything.

---

[64] *Evans v. Avande, Inc.*, 2021 WL 4344020, at *4 (Del. Ch. Sept. 23, 2021).

[65] *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1108 (Del. Ch. 2012).

[66] *Huret v. MondoBrain, Inc.*, 2022 WL 1232582, at *3 (Del. Ch. Apr. 27, 2022) (internal quotation marks omitted).

[67] *See Hermelin*, 54 A.3d at 1107 ("Whether the prosecution . . . intended for the indemnitee to be successful is clearly irrelevant. One can only imagine the difficulty an indemnitee would face in eliciting testimony from a prosecutor that she intended for the [indemnitee] to succeed . . . . Delaware law does not require such abstractions; instead, the only relevant consideration is what the result was, not why it was." (internal quotation marks omitted)).

[68] Dkt. 100 at 16 ("Harkonen Br.").

The Pardon did not overturn Harkonen's conviction or "restore" or create an unconditional right to indemnification under Section 145(c).

### 2. The Pardon Does Not Constitute "Success."

According to Harkonen, receipt of a pardon constitutes success because a "[p]ardon is a synonym for vindicate and vindicate is a synonym for pardon."[69] It is true that "success is vindication[.]"[70] But a conviction is neither.[71] And the Pardon did not overturn Harkonen's conviction—far from it. The U.S. Pardon Attorney explained to Harkonen that the Pardon did not "erase or expunge [his] conviction[.]"[72] So Harkonen remains unsuccessful, pardoned or not.

To recast an executive act of clemency as a judicial order of expunction, Harkonen cites *Ex Parte Garland*.[73] That decision was issued in 1866 and stated that a pardon "blots out the existence of guilt, so that in the eye of the law the

---

[69] *Id.* at 17 (citing "Thesaurus.com").

[70] *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *10 (Del. Ch. July 14, 2009) (internal quotation marks omitted). *See Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 95–96 (2d Cir. 1996) (interpreting Section 145(c) and observing that "vindication" has been used in Delaware precedent "as a synonym" for "success").

[71] *See, e.g.*, *Hermelin*, 54 A.3d at 1109 ("In the criminal context, . . . a conviction . . . equates with failure."); *Stockman*, 2009 WL 2096213, at *10 ("An indemnitee in a criminal proceeding is successful any time she avoids a conviction: 'success is vindication[;] any result other than conviction must be considered success.'" (cleaned up) (quoting *Merritt-Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138, 141 (Del. Super. 1974))).

[72] DX J (Pardon).

[73] 71 U.S. (4 Wall.) 333 (1866).

22

offender is as innocent as if he had never committed the offense."[74]  Based on a select batch of (largely dissenting) opinions that have cited *Garland* approvingly, Harkonen suggests that a pardon really does invalidate a conviction.[75]

Harkonen's invocation of *Garland* runs headlong into a phalanx of modern authority rejecting its "blot out" language as *dictum*.  In *United States v. Noonan*, for example, the United States Court of Appeals for the Third Circuit explained that a pardon "is an executive prerogative of mercy, not of judicial record-keeping."[76]  Given that distinction, the Third Circuit held (*contra Garland*) that a presidential pardon does not "create any factual fiction" that the conviction never happened.[77]

*Noonan* reflects the majority view.  The Supreme Court of the United States has since explained that "the granting of a pardon is in no sense an overturning of a . . . conviction[.]"[78]  A presidential pardon "does not erase a judgment of conviction, or its underlying legal and factual findings."[79]  Contrary to *Garland*'s *dictum*, a

---

[74] *Id.* at 380.

[75] Harkonen Br. at 18 & n.13.

[76] 906 F.2d 952, 955–60 (3d Cir. 1990).

[77] *Id.* at 958–60.

[78] *Nixon v. United States*, 506 U.S. 224, 232 (1993).

[79] *United States v. Arpaio*, 2017 WL 4839072, at *1 (D. Ariz. Oct. 19, 2017) (citing *United States v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004)), *aff'd*, 951 F.3d 1001 (9th Cir. 2020).

presidential pardon "in no way reverses the legal conclusion of the courts; it 'does not blot out guilt or expunge a judgment of conviction.'"[80]

Delaware agrees. Citing *Noonan*, the Delaware Supreme Court has rejected *Garland* and adopted the majority view on the effect of a presidential pardon:

> A pardon involves forgiveness and not forgetfulness and does not wipe the slate clean . . . . We [have] rejected . . . *Garland*, observing that a century of judicial sculpturing has left more form than substance to the opinion . . . .[81]

Under Delaware law, "a pardon does not erase guilt" or "create any factual fiction that the offense [did] not occur[.]"[82]

In sum, federal and Delaware precedent teaches that a presidential pardon does not invalidate or expunge the underlying conviction or determine factual or legal innocence. So the Pardon does not constitute success.

---

[80] *Hirschberg v. CFTC*, 414 F.3d 679, 682 (7th Cir. 2005) (quoting *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994)). *See, e.g., United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001); *see also Frequently Asked Questions,* Off. of the Pardon Att'y, U.S. Dep't of Just., https://www.justice.gov/pardon/frequently-asked-questions (last updated Feb. 28, 2023) ([Q.] "Does a presidential pardon expunge or erase the conviction for which the pardon was granted?" [A.] "No. Expungement is a judicial remedy that . . . cannot be granted within the Department of Justice or by the President. Please also be aware that if you were to be granted a presidential pardon, the pardoned offense would not be removed from your criminal record. Instead, both the federal conviction as well as the pardon would both appear on your record . . . ."); Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 Harv. L. Rev. 647, 648 (1915) ("[T]he vast majority of [pardonees] were in fact guilty; and when it is said that in the eye of the law they are as innocent as if they had never committed an offence, the natural rejoinder is, then the eyesight of the law is very bad.").

[81] *State v. Skinner*, 632 A.2d 82, 84–85 (Del. 1993) (internal quotation marks omitted).

[82] *Heath v. State*, 983 A.2d 77, 81 (Del. 2009) (internal quotation marks omitted).

24

To steer the analysis away from his conviction, Harkonen claims that the Pardon constitutes success because it is "innocence-based."[83] The logic appears to go like this: Harkonen said he was innocent in his pardon application; he received the Pardon; so the President must have determined that he did not commit wire fraud.

The record contradicts Harkonen's position. For one, innocence was not the only stated ground for Harkonen's pardon application. He also sought clemency to reinstate his medical license during the COVID-19 pandemic. For another, the U.S. Pardon Attorney told Harkonen that the Pardon "does not indicate [his] innocence."[84] I need not draw unreasonable inferences in Harkonen's favor.[85]

In search of support for the idea that the Pardon exonerated him, Harkonen found *Lorance v. Commandant*.[86] But *Lorance* is no help. There, a convicted murderer applied for a pardon and asserted his innocence in the application.[87] The pardon he received contained the exact same letter that was sent to Harkonen: "A presidential pardon . . . does not erase or expunge the record of conviction *and does*

---

[83] Harkonen Br. at 26–33.

[84] DX J (Pardon).

[85] *See Smith v. Del. State Univ.*, 47 A.3d 472, 477 (Del. 2013). If I were to credit Harkonen's inference, I would arguably be placed in the position of declaring—in the stead of the President and United States Department of Justice—that a person convicted of a federal crime is innocent of the crime simply because that person wrote the word "innocent" in his pardon application.

[86] 13 F.4th 1150 (10th Cir. 2021).

[87] *Id.* at 1158.

*not indicate innocence.*"[88]  Given the letter, the *Lorance* court found that the pardon did *not* determine he was innocent and that his *habeas* proceedings were not moot. *Lorance*, if anything, confirms that receipt of a pardon does not prove innocence.

Harkonen's discussion of innocence distracts from a more fundamental issue. This is a civil action brought in a court of equity under a corporate indemnification statute.  This Court does not inquire into whether a corporate official whose conviction has not been overturned nevertheless "has been adjudged innocent in some ethical or moral sense."[89]  Instead, this Court determines success by looking to what the official "was charged with or formally accused of" and then comparing that with "the result . . . actually achieved."[90]  Harkonen was charged with and convicted of wire fraud.  That is all that matters.

Harkonen last claims the Pardon constitutes success because the Pardon removed the "civil disabilities" caused by his conviction.  Harkonen ranks Section 145(c) indemnification among the "basic civil rights" restored by pardons and then concludes that any failure to grant him indemnification would "punish" him based on a pardoned crime.  Such a "punishment," he says, would violate the Pardon and

---

[88] *Id.* (emphasis in original) (quoting the defendant's pardon).

[89] *Zaman v. Amadeo Hldgs., Inc.*, 2008 WL 2168397, at *22 (Del. Ch. May 23, 2008) (Strine, V.C.); *accord Evans*, 2021 WL 4344020, at *4; *Brown*, 2019 WL 2244738, at *6; *Hermelin*, 54 A.3d at 1107 n.50; *Stockman*, 2009 WL 2096213, at *10 n.44.

[90] *Huret*, 2022 WL 1232582, at *3 (cleaned up).

the Supremacy Clause of the United States Constitution.[91]  Harkonen's reasoning is difficult to follow and fails for several reasons.

To begin, convictions do not constitute success, on the merits or otherwise. The Pardon did not overturn Harkonen's conviction.  End of story.

Plus, it would be a strain to classify corporate officer indemnification as a basic civil right.  That term refers to the fundamental rights that belong to all United States citizens, such as voting, serving on a jury, and holding public office.[92]  Indeed, the Pardon itself defined basic civil rights this way.[93]  Indemnification afforded to corporate officials under a Delaware statute is obviously not a right enjoyed by every citizen in the country.

To suggest otherwise, Harkonen relies on *Heath v. State*,[94] where the defendant was convicted of a crime that required him to register as a sex offender. Years later, the Governor pardoned the conviction.  A gubernatorial pardon

---

[91] Harkonen Br. at 34.

[92] *See Bjerkan v. United States*, 529 F.2d 125, 128–29 (7th Cir. 1975) (discussing "basic civil rights" and reasoning that a "full pardon would seem to intend [] that the [pardonee] be reinstated to his full rights as a citizen"); *Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi.*, 357 F.3d 677, 681 n.5 (7th Cir. 2004) (declining to expand the concept of basic civil rights to include "restoration of vested annuity benefits created by [Illinois] law"); *see also Logan v. United States*, 552 U.S. 23, 28 (2007) (observing that term "basic civil rights" used in connection with pardon exception to firearm sentencing enhancement statute has been defined as "rights to vote, hold office, and serve on a jury").

[93] *See* DX J (Pardon) (*e.g.*, voting; serving on a jury; holding public office).

[94] 983 A.2d 77 (Del. 2009).

27

"restor[es] all civil rights."[95]  The State conceded that registration was "tantamount to the restriction of a civil right."[96]  So the Delaware Supreme Court held that the pardon extinguished the defendant's registration duties.  The *Heath* decision does not have anything to do with indemnification and did not redefine basic civil rights.

Moreover, Section 145(c) does not provide for an unconditional right to indemnification.  The "right to indemnification" under Section 145(c) does not become "absolute" until the officer "meets the requirements" of the statute.[97]  One of those requirements is success.  So Harkonen did not lose his right to indemnification.  He never acquired it.  Accordingly, even if, somehow, corporate indemnification could be a "basic civil right," the Pardon did not "restore" it.[98]

In a last gasp, Harkonen turns to *United States v. Klein*,[99] a *Garfield*-era decision addressing the separation of powers.  President Johnson issued pardons to

---

[95] *See* 11 *Del. C.* § 4364.

[96] *Heath*, 983 A.2d at 80.

[97] *Perconti v. Thornton Oil Corp.*, 2002 WL 982419, at *3 (Del. Ch. May 3, 2002).  *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 4.12, Westlaw (4th ed. & 2023 Supp.) ("Entitlement to indemnification is not automatic, whether permissive or mandatory, whether by statute, by-law, or contract." (quoting E. Norman Veasey et al., *Delaware Supports Directors with a Three-Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 408 (1987))).

[98] *See, e.g.*, *Buchmeier v. United States*, 581 F.3d 561, 565 (7th Cir. 2009) (en banc) (Easterbrook, C.J.) ("*Logan* holds that, if a person never loses any of the 'big three' civil rights [*i.e.*, those identified *supra* note 92], then they cannot be 'restored' . . . . To restore means to give back." (emphasis omitted)).

[99] 80 U.S. (13 Wall.) 128 (1871).

rebel sympathizers whose property was seized by the federal government during the American Civil War. The pardon allowed the former rebels to bring a reimbursement or replevin action so long as they swore an oath of loyalty to the United States. Congress sought to undercut the pardon by enacting a statute deeming the loyalty oath inadmissible in an action for the property value. The *Klein* decision invalidated the statute, concluding that Congress infringed the President's absolute authority to issue pardons. *Klein* does not address, let alone purport to preempt, a state statute that ties indemnification for a criminal case to a successful defense.

*Klein* has been described as "a deeply puzzling decision," and the Supreme Court of the United States has cautioned that its language should not be taken "at face value."[100] Harkonen analogizes the right of reimbursement offered by the *Klein* pardon to "[]eligibility for indemnity" under the DGCL,[101] but the two are quite different. In any event, the right in *Klein* was conditioned on a loyalty oath. The confederates met that condition. Section 145(c) depends on success. Harkonen has never met that condition.

Harkonen is not entitled to indemnification under Section 145(c). The Company's motion is granted and Harkonen's motion is denied.

---

[100] *See Bank Markazi v. Peterson*, 578 U.S. 212, 226–28 (2016).

[101] Harkonen Br. at 21.

## B.	Indemnification Under Section 145(a)

I turn now to Section 145(a).  The Company agreed "to hold harmless and indemnify [Harkonen] *to the fullest extent authorized or permitted by*" the DGCL.[102] The Company also agreed to indemnify Harkonen "*to the fullest extent not prohibited by* the DGCL[.]"[103]  So the Company agreed to treat as mandatory the otherwise permissive indemnification offered under Section 145(a).[104]

> Reformatted and condensed for clarity, Section 145(a) provides that:
>
> A corporation [may] indemnify any person who was a party to any criminal proceeding, by reason of the fact that the person was a director [or] officer of the corporation, if[:]
>
> > (i) the person acted in good faith[;] and
> >
> > (ii) in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation[;] and
> >
> > (iii) with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful[.]
>
> [A] conviction shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.[105]

---

[102] PX F § 2 (Indemnity Agreement) (emphasis added).

[103] PX G § 43(a) (Bylaws) (emphasis added).

[104] *See Stockman*, 2009 WL 2096213, at *12 ("The 'to the full extent permitted by law' language is . . . an expression of the intent for the promise of indemnity to reach as far as public policy will allow." (internal quotation marks omitted)).

[105] 8 *Del. C.* § 145(a).

The last sentence is important to this case (the "No-Presumption Provision").

The parties have framed the Section 145(a) inquiry in terms of issue preclusion. Their preclusion framework, in turn, involves a determination of whether Harkonen's conviction conclusively established his state of mind. To analyze that issue, I first consider whether Section 145(a) incorporates collateral estoppel into the criminal context. If so, I next consider whether Harkonen's conviction precludes him from relitigating the issue of good faith. Based on that analysis, the Company is entitled to summary judgment in its favor.

### 1. Section 145(a) Incorporates Preclusion Principles.

Enacted in 1967, the present version of Section 145 was drafted by a committee of eminent corporate lawyers. At that time, "no subject was more discussed by [the committee] than the subject of indemnification[.]"[106]

Criminal indemnification was no exception. The committee observed that neighboring states provided for criminal indemnification,[107] and believed Delaware should too.[108] Still, it was "apparent" to the committee that "limitations . . . must

---

[106] Samuel Arsht & Walter K. Stapleton, *Delaware's New General Corporation Law: Substantive Changes*, 23 Bus. Law. 75, 77–78 (1967) ("Arsht & Stapleton").

[107] See Ernest L. Folk III, *Review of the Delaware General Corporation Law for the Delaware Corporation Law Revision Committee* 78–80 (1964) ("*Folk Report*").

[108] *See id.*; Royall Victor, Address to Association of General Counsel, at 7, 12, 20 (Oct. 20, 1966) ("Victor Address").

necessarily be placed on the power to indemnify" criminal wrongdoing.[109] The committee was concerned that Delaware would be subject to "considerable criticism" if Section 145 were to "afford[] indemnity to a person who willfully violated a criminal statute[.]"[110]

During the drafting process, the general consensus was that, "despite a conviction, it may be appropriate to award indemnification."[111] But early drafts did not include language that would bar indemnification for offenses committed with knowledge of illegality.[112] So the committee received numerous calls to impose more "stringent" requirements for indemnification.[113] The committee responded by revising the draft to harmonize Section 145(a) with "the substantive provisions of the criminal law[.]"[114] The committee gave those revised terms "careful attention"

---

[109] Arsht & Stapleton at 78.

[110] Memo. from Fredric J. Klink, to S. Samuel Arsht, at ¶ 4 (Jan. 11, 1967) ("Klink Memo"). *See* Letter from W.F. Kenney, to Henry M. Canby, at 1 (Dec. 16, 1966) ("Kenney Letter") ("A corporation should not be required to indemnify a crook . . . ."); *see also* Letter from S. Samuel Arsht, to Richard F. Corroon and Henry F. Canby, at 2 (Feb. 15, 1967) (expressing "reservations" about allowing indemnification for less than complete success).

[111] *Folk Report* at 79.

[112] *See id.* at 95.

[113] Victor Address at 20; *see, e.g.*, Attach. to Letter from Orvel Sebring, to S. Samuel Arsht (Feb. 12, 1967); Attach. to Letter from Robert A. McDowell, to S. Samuel Arsht (Jan. 18, 1967); Letter from John Mulford, to S. Samuel Arsht (Jan. 18, 1967); Attach. to Klink Memo; Attach. to Letter from Henry Canby, to S. Samuel Arsht, Richard F. Corroon, Charles S. Crompton, Jr., Charles F. Richards, Jr., and Walter K. Stapleton (Jan. 5, 1967).

[114] Arsht & Stapleton at 78. *See, e.g.*, Kenney Letter at 2 (opining that a reasonable cause standard would render "more definitive" Section 145(a)'s good faith element).

and chose them "deliberately."[115]  The terms have been "best read" as "public policy limits designed to prevent corporations from indemnifying corporate officials . . . [who] have been convicted . . . as a result of culpable conduct *and* that liability was the result of conduct that involved a certain level of scienter."[116]

Section 145(a) "limit[s] . . . [the] risk that indemnification will encourage officers to break the law[.]"[117]  After all, indemnification is "not a blank check for corporate officials."[118]  It is designed to promote their "honesty and integrity."[119] The goal of Section 145(a) thus was to eliminate indemnification for willful violations of positive law.

To meet that objective, the drafters added the No-Presumption Provision.[120] The No-Presumption Provision provides that a conviction *in general* does not create

---

[115] *Green v. Westcap Corp.*, 492 A.2d 260, 265 (Del. Super. 1985) (applying Section 145 in criminal context and describing drafting committee's intent).

[116] *Stockman*, 2009 WL 2096213, at *10 (Strine, V.C.) (emphasis in original).  *See In re Massey Energy Co. Deriv. Litig.*, 2011 WL 2176479, at *16 (Del. Ch. May 31, 2011) (A corporation cannot indemnify a fiduciary who was criminally convicted for "bad faith misconduct" or "other wrongdoing involving scienter."); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006) ("[U]nder Delaware statutory law a director or officer . . . [cannot] be indemnified . . . for a violation of the duty to act in good faith." (discussing Section 145(a))).  Even Harkonen's counsel has conceded that an officer cannot obtain indemnification under Section 145(a) if the officer is convicted of willfully violating positive law.  *See* Tr. at 66:2–7.

[117] *Stockman*, 2009 WL 2096213, at *10.

[118] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 186 (Del. Ch. 2003) (Strine, V.C.).

[119] *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998).

[120] *See* Victor Address at 15–16 ("I can readily envisage a number of situations where criminal sanctions are imposed in which the culpability of the . . . officer is no greater than

a presumption. It does not open a pathway to indemnification for a conviction based on bad faith, willful misconduct, or a similar *mens rea*. Nor does it defeat the preclusive effect of those states of mind and courses of action on a subsequent indemnification determination. As this Court explained in *Sun-Times Media Group, Inc. v. Black*:

> [I]f to obtain conviction the prosecution was required to prove that the person had a non-indemnifiable state of mind, that would be conclusive evidence that the person is not entitled to indemnification, irrespective of § 145(a)'s statement that a conviction "shall not, of itself, create a presumption" that the convicted official had a non-indemnifiable state of mind. That is, the mere fact of being convicted of a crime does not create a presumption of a non-indemnifiable state of mind, but if, for example, a corporate official were convicted of [a crime of bad faith intent], that conviction would be conclusive evidence that the official acted with a non-indemnifiable state of mind.[121]

In short, the No-Presumption Provision does not apply if the crime of conviction "included as one of its essential elements a jury finding that the official had a non-indemnifiable state of mind."[122] Accordingly, a corporate officer who has been convicted of a crime involving bad faith, willful misconduct, or a similar *mens rea*, is precluded from relitigating "good faith" under Section 145(a).[123]

---

that involved where he must stand responsible for some civil judgment . . . . [I]ndemnification of a man found guilty in [certain situations] may well be justified.").

[121] *Sun-Times*, 954 A.2d at 401 n.83.

[122] *Id.* at 401.

[123] *See Hermelin*, 54 A.3d at 1112; *Sun-Times*, 954 A.2d at 401 n.83, 403.

Harkonen denigrates *Sun-Times* as *dicta*, but subsequent authority has adopted it. In *Hermelin v. K-V Pharmaceutical Co.*,[124] for example, this Court considered the effect of a corporate officer's guilty plea to strict liability misdemeanors on the scope of evidence relevant to determining the officer's state of mind for purposes of Section 145(a). The officer argued that his guilty plea conclusively established good faith and thus cabined the evidentiary record to the underlying criminal action.[125] The company countered that, given the nature of strict liability offenses—which generally lack an intent element—a trial on the officer's state of mind was necessary to decide good faith.[126]

The *Hermelin* decision accepted the company's arguments and ordered a plenary trial on the officer's state of mind.[127] Relying on *Sun-Times*, the *Hermelin* decision emphasized that the outcome would have been different if "the underlying proceeding established that the [officer] acted in bad faith, particularly through a showing that the [officer] knew that his actions were damaging to the company or that his conduct was unlawful," which would serve as "'conclusive evidence that the

---

[124] 54 A.3d 1093 (Del. Ch. 2012).

[125] Pl.'s Mem. of L. Regarding the Applicable Legal Standards for and Appropriate Scope of Discovery as to Each of Pl.'s Indemnification Claims, *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093 (Del. Ch. 2012), 2011 WL 6441739 (Del. Ch. Dec. 15, 2011).

[126] Def.'s Opening Br. Addressing Mandatory Indemnification and the Scope of Discovery Under Section 145(a), in *id.*, 2011 WL 6441736 (Del. Ch. Dec. 15, 2011).

[127] *Hermelin*, 54 A.3d at 1112–15.

[officer] is not entitled to indemnification.'"[128]   Those "bad faith" facts, if present, would have triggered a "fundamental application" of preclusion.[129]

The use of preclusion in this setting reflects a sound policy judgment that this Court should not second guess a factual finding where the evidence in the prior trial established, beyond a reasonable doubt, a non-indemnifiable state of mind.  It is also consistent with the doctrine of collateral estoppel itself.[130]   Collateral estoppel "prohibits a party from relitigating a factual issue that was adjudicated previously."[131]   It is "a rule of repose designed to end litigation."[132]   And it "conserves judicial resources."[133]   Indeed, a principal "objective" of collateral estoppel is "judicial finality."[134]   "The fundamental basis of the doctrine of . . . collateral estoppel[] is that . . . a litigant may have one day in court but not two."[135]

---

[128] *Id.* at 1112 (quoting *Sun-Times*, 954 A.2d at 401 n.83).

[129] *Id.*

[130] Delaware law recognizes that a criminal judgment may have preclusive effect in a subsequent civil case.  *See Brown v. State*, 214 A.3d 922 (Del. 2019); *Rogers v. Morgan*, 208 A.3d 342 (Del. 2019).

[131] *M.G. Bancorp. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).

[132] *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del. 1968).

[133] *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1993).

[134] *NTC Gp., Inc. v. W. Point-Pepperell, Inc.*, 1990 WL 177497, at *4 (Del. Ch. Oct. 2, 1990) (Hartnett, V.C.); *accord Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 236945, at *1 (Del. Ch. Sept. 8, 1992) (Allen, C.); *see also LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191–92 (Del. 2009) (articulating the same policy considerations in the *res judicata* context).

[135] *Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc.*, 148 A.2d 770, 775 (Del. 1959).

Section 145 points in the same direction.[136]  An indemnification claim does not accrue until the underlying proceeding is completed.[137]  A court cannot determine whether state of mind is relevant until the underlying action is over, because if the covered person is successful, then a state of mind inquiry is unnecessary.[138]  Plus, both the corporation and the covered person are entitled to know when the underlying claim has been fully resolved.[139]

Fully resolved means just that.  It does not mean relitigating resolved issues under the guise of a Section 145(a) proceeding.  In addressing indemnification under Section 145(a), it is "critical" that I "simultaneously apply the patina of Section 145's policy."[140]  Text and policy support an application of collateral estoppel here.

---

[136] *See Smith v. Guest*, 16 A.3d 920, 927 n.34 (Del. 2011) ("Courts may assume that [the legislature] 'has legislated with an expectation that preclusion principles will apply except when a statutory purpose to the contrary is evident.'" (alterations omitted) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991))).

[137] *See, e.g.*, *Sun-Times*, 954 A.2d at 401–08; *accord Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1280 & n.36 (Del. 2016) ("[N]umerous decisions of our Court of Chancery have consistently held that an indemnity claim does not accrue until the underlying action is resolved." (collecting Section 145 precedent)).

[138] *See, e.g.*, *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009).

[139] *See, e.g.*, *Sun-Times*, 954 A.2d at 403–04; *Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919 (Del. 2004).

[140] *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *15 (Del. Ch. Sept. 11, 2015) (alteration and internal quotation marks omitted).

## 2. Harkonen's Conviction Established His State Of Mind.

The law of the rendering jurisdiction governs the preclusion analysis.[141] Where, as here, the judgment was rendered under federal law, federal law controls.[142] The Supreme Court of the United States "'regularly turns to the Restatement (Second) of Judgments for . . . the ordinary elements of issue preclusion.'"[143] Under the Restatement, issue preclusion applies if (i) "an issue of fact or law is actually litigated" in a prior proceeding; (ii) the issue is "determined by a valid and final judgment"; and (iii) "the determination is essential to the judgment."[144]

There is no reasonable dispute that Harkonen's conviction is a valid, final judgment. Nor is there a reasonable dispute that his state of mind was actually litigated during his criminal proceedings. And there is no reasonable dispute that his intent was essential to the guilty verdict. The only question, then, is whether the jury determined that he did not act in good faith. It did.

---

[141] *See Playtex*, 584 A.2d at 1217–18.

[142] *See Pagliara v. Fed. Nat'l Mortg. Ass'n*, 2017 WL 2352150, at *3 (Del. Ch. May 31, 2017) (Montgomery-Reeves, V.C.). *See Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001).

[143] *Pagliara*, 2017 WL 2352150, at *3 (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015)).

[144] Restatement (Second) of Judgments § 27 (1982).

### a. The Conviction Actually Decided The Issue Of Good Faith.

To prove wire fraud, the government must establish beyond a reasonable doubt that the defendant acted with the intent to defraud.[145] An intent to defraud is "essentially the opposite of good faith."[146] As a result, "a finding of the intent to defraud necessarily implies that there was no good faith."[147] In other words, a wire fraud conviction necessarily determines that the defendant acted in bad faith.[148] Every federal court agrees.[149]

Here, a jury heard evidence of Harkonen's intent during a six-week trial. At the close of evidence, the district court instructed the jury on wire fraud's intent to

---

[145] *See Harkonen IV*, 510 F. App'x at 636; *see generally* 18 U.S.C § 1343.

[146] *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991).

[147] *United States v. Bowling*, 619 F.3d 1175, 1185 (10th Cir. 2010) (en banc) (cleaned up).

[148] *See United States v. Johnson*, 874 F.3d 990, 1002 (7th Cir. 2017) (observing that a "lack of good faith is part" of a wire fraud charge), *cert. denied*, 138 S. Ct. 1275 (2018).

[149] *See, e.g.*, *United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) ("[A] finding of specific intent to deceive categorically excludes a finding of good faith."); *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir. 1992) ("[A] jury finding that the defendant has acted knowingly and willfully is inconsistent with a finding that the defendant acted in good faith."), *cert denied*, 506 U.S. 965 (1992); *accord United States v. Stephens-Miller*, 582 F. App'x 626, 637 (6th Cir. 2014); *United States v. Frega*, 179 F.3d 793, 804 (9th Cir. 1999); *United States v. Mancuso*, 42 F.3d 836, 847 (4th Cir. 1994); *United States v. McElroy*, 910 F.2d 1016, 1025–26 (2d Cir. 1990); *United States v. Judd*, 889 F.2d 1410, 1413–14 (5th Cir. 1989); *United States v. Sanders*, 834 F.2d 717, 719 (8th Cir. 1987); *United States v. Butler*, 822 F.2d 1191, 1197 (D.C. Cir. 1987); *see also United States v. Pomponio*, 429 U.S. 10, 12–13 (1976) ("[T]he word 'willfully' . . . generally connotes a voluntary, intentional violation of a known duty . . . . [The court] adequately instructed the jury on willfulness. An additional instruction on good faith was unnecessary." (citation omitted)).

defraud element.[150]    Then the jury found Harkonen guilty of wire fraud. Accordingly, the jury actually decided that Harkonen acted in bad faith.

Harkonen's direct appeal dispels any doubt.  On appeal, Harkonen argued that the district court should have given the jury a good faith instruction.  The court of appeals explained that "no good faith instruction [was] required" because "the specific intent instruction covered Harkonen's [good faith] defense."[151]  The jury rejected that defense based on "overwhelming" and "convincing" evidence of his bad faith.[152]  So Harkonen cannot relitigate his state of mind anymore.

To resist this result, Harkonen cites the No-Presumption Provision.  But, as discussed, this language does not apply if the crime of conviction was committed with bad faith intent.  Intent is an ultimate issue of fact.  And, under the Restatement, "if the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact."[153]  Harkonen's conviction closed the record, and collateral estoppel has sealed it shut.

Under the DGCL, a conviction will not be presumed to conclusively establish bad faith unless bad faith is actually decided in the guilty verdict.  Here, Harkonen

---

[150] *Harkonen II*, 2010 WL 2985257, *3.

[151] *Harkonen IV*, 510 F. App'x at 638.

[152] *Harkonen II*, 2010 WL 2985257, *2, *10–12.

[153] Restatement (Second) of Judgments § 27 cmt. c.

was convicted of a crime involving bad faith. And, as explained later, he had many opportunities to overturn his conviction. There is, then, no presumption to violate.

### b. Harkonen Had A Full And Fair Opportunity To Litigate His Intent.

There is one final possibility for Harkonen. The Restatement instructs that issue preclusion should not be applied if the opposing party "lacked a full and fair opportunity to litigate the issue[.]"[154] The Restatement separately advises that issue preclusion should not be applied if "other circumstances justify affording [the party] an opportunity to relitigate the issue."[155] The "other circumstances" exception applies where a third party seeks in a civil action to preclude a former criminal defendant from relitigating issues decided adversely to the defendant in the defendant's prosecution.[156] The "other circumstances" exception involves a multi-factor balancing test that identifies no less than thirteen considerations.[157]

"Multi-factor tests can sometimes make the mind glaze over, and obscure their own fundamental purposes."[158] A comment to the Restatement explains that the

---

[154] *Id.* § 29. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332 (1979). The full-and-fair exception is consistent with Delaware law on offensive, non-mutual preclusion. *See, e.g.*, *Hawk Inv. Hldgs. Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *14 (Del. Ch. Nov. 29, 2022) (citing *Playtex*, 584 A.2d at 1217).

[155] Restatement (Second) of Judgments § 29.

[156] *See id.* § 85(2)(a).

[157] *See id.* §§ 28–29.

[158] *Fletcher Int'l, Inc. v. ION Geophysical Corp.*, 2012 WL 1883040, at *9 (Del. Ch. May 23, 2012) (Strine, C.).

touchstone of issue preclusion is "due process."[159]  If the opposing party had a full

and fair opportunity to litigate the preclusive issue, then "there is no good reason for

refusing to treat the issue as settled[.]"[160]  As the Supreme Court of the United States

has admonished,

> Permitting repeated litigation of the same issue . . . reflects either the aura of the gaming table or a lack of discipline . . . . Although . . . judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.[161]

More than wasteful, endless relitigation disturbs the finality of judgments.

Convictions are no less susceptible.  Finality is central to federal criminal law,[162]

---

[159] Restatement (Second) of Judgments § 29 cmt. b.  *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 (1982) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." (internal quotation marks omitted)).

[160] Restatement (Second) of Judgments § 29 cmt. b.  During oral argument, Harkonen's counsel seemed to suggest that the "compelling circumstances" factor, *see id.* § 29(8), is the only truly relevant one, *see* Tr. at 66:17–21 ("[T]he Restatement lists 13 factors.  All don't apply, obviously, but maybe four or five do, and I'm going to go to the last . . . which is compelling circumstances . . . .").  Counsel then proceeded to make due process-based arguments.  *See* Tr. at 66–74.  So I combine both considerations here.

[161] *Parklane*, 439 U.S. at 328 (internal quotation marks and citation omitted).

[162] *See, e.g.*, *Shinn v. Ramirez*, 142 S. Ct. 1718, 1739 (2022) ("Serial relitigation of final convictions undermines the finality that is essential to both the retributive and deterrent functions of criminal law." (internal quotation marks omitted)); *McCleskey v. Zant*, 499 U.S. 467, 479–89 (1991) (curbing successive collateral attacks using the "abuse of the writ" doctrine); *United States v. Frady*, 456 U.S. 152, 164–65 (1982) (explaining that federal "trial and appellate procedures are not so unreliable" as to condone "endless postconviction collateral attacks.").

which presumes that convictions are valid.[163]  Given that I am applying federal law,

I am mindful of the existence of federal post-conviction rules procedurally barring

successive challenges to convictions that are based on arguments previously rejected

during the defendant's direct or collateral proceedings.[164]

Harkonen received due process.  Throughout the Criminal Action, Harkonen

"consistently demonstrated that he was willing and able to apply [his] resources to

challenging his conviction."[165]

- Before trial, Harkonen moved to dismiss the indictment on the ground that the press release merely contained good faith expressions of scientific opinion.[166]

- During trial, Harkonen "amply" tested the government's evidence of his intent, thus expanding the record to include topics of "statistical significance" and "debates surrounding" the methods underlying the clinical study.[167]

- After trial, Harkonen moved for acquittal, arguing the government failed to introduce sufficient evidence to prove beyond a reasonable doubt that he acted with the intent to defraud.[168]

---

[163] *See, e.g.*, *Parke v. Raley*, 506 U.S. 20, 29–30 (1992); *see also Herrera v. Collins*, 506 U.S. 390, 399 (1993) ("Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."); *Sun-Times*, 954 A.2d at 396 n.62 (relying on *habeas* precedent to define finality under Section 145).

[164] *See, e.g.*, 28 U.S.C. § 2255(h).  The Supreme Court of the United States considers *coram nobis* petitions to be "collateral attacks," which are regulated under the procedural bars of Section 2255 of the *habeas* statute.  *See Wall v. Kholi*, 562 U.S. 546, 552–53 (2011).

[165] *Harkonen V*, 2015 WL 4999698, at *7.

[166] *Harkonen I*, 2009 WL 1578712, at *7.

[167] *Harkonen III*, 2011 WL 13250647, at *8.

[168] *Harkonen II*, 2010 WL 2985257, at *10, *12–14.

- After trial, Harkonen sought a new trial under *Matrixx*.[169]

- On direct appeal, Harkonen renewed all these arguments and added that the district court should have instructed the jury on his good faith.[170]

- In his first petition for a writ of *certiorari*, Harkonen reasserted the press release as a good faith expression of scientific opinion.[171]

- On collateral attack, Harkonen argued that his counsel ineffectively failed to introduce expert testimony from Goodman, who purportedly would have supported his good faith use of certain scientific methods.[172]

- On collateral appeal, Harkonen renewed his *Matrixx* and ineffective assistance arguments.[173]

- In his second petition for a writ of *certiorari*, Harkonen claimed—for a third time—that the *Matrixx* decision proved his innocence.[174]

Harkonen litigated intent at least ten times. Adding the insurance arbitrations brings the figure to twelve. The quasi-legal memorandum makes thirteen. Throughout, Harkonen was represented by sophisticated counsel, including a now-sitting judge. Two federal courts held that his lawyers provided effective assistance.

Harkonen seeks to use this proceeding as a fourteenth opportunity to relitigate his state of mind. But there is nothing new. The federal courts considered and rejected all the issues he identifies in his motion. Federal post-conviction rules

---

[169] *Harkonen III*, 2011 WL 13250647, at *8–9.

[170] *Harkonen IV*, 510 F. App'x at 636, 638.

[171] Pet. for Writ of Cert., 2013 WL 4027035, at *15–21.

[172] *Harkonen V*, 2015 WL 4999698, at *7–9.

[173] *Harkonen VI*, 705 F. App'x at 606.

[174] Pet. for Writ of Cert., 2018 WL 4819016, at *5, *25–29.

would preclude relitigation of issues already considered and rejected in federal court. Under those rules, not only would *Harkonen* be precluded from relitigating the merits of the underlying evidence, but also *a reviewing court* would be precluded from reopening the record to examine that evidence for itself.[175]  I cannot grant Harkonen access to a form of collateral review—particularly in this civil indemnification proceeding—that would be unavailable to any other person convicted of a federal crime.

Section 145(a) precludes relitigation of the issue of good faith if the official committed a crime with bad faith intent.  Harkonen committed a crime with bad faith intent.  He is therefore precluded from relitigating the issue of good faith. The Company's motion is granted and Harkonen's motion is denied.

## C.    The Judicial Admissions Doctrine

Having found no support in Section 145(a), Harkonen tries to rewrite it. Harkonen alternatively argues that I must disregard the decisions of district judges, circuit judges, Justices of the Supreme Court of the United States, and twelve jurors, because the Company "admitted" during the parties' insurance arbitrations that he "acted with an indemnifiable state of mind."[176]  Harkonen thus invokes the judicial

---

[175] *Harkonen VI*, 705 F. App'x at 606.

[176] Dkt. 107 at 12, 26–27.

admissions doctrine[177] to obtain indemnification for a verdict finding that he willfully violated positive law. Harkonen misapprehends the scope of a judicial admission and his position, if accepted, would enable corporations to indemnify conduct that Section 145 has deemed non-indemnifiable.

Judicial admissions are "[v]oluntary and knowing *concessions of fact* made by a party during judicial proceedings (*e.g.*, . . . counsel's statements to the court)."[178] They "are limited to factual matters in issue and not to statements of legal theories or conceptions."[179] Counsel's "legal theories or conceptions" are not binding as judicial admissions.[180] Accordingly, the judicial admissions doctrine generally does not apply to a "contract interpretation."[181]

---

[177] The parties agree that the judicial admission doctrine applies where the previous proceeding is an arbitration. So I assume, without deciding, that it does. I also note that, in its cross motion, the Company framed the analysis in terms of judicial estoppel. Harkonen countered that judicial estoppel is the wrong framework. Because I must grant summary judgment to the Company even on Harkonen's preferred framework, I do not need to discuss judicial estoppel. For completeness, however, I conclude that judicial estoppel would be no bar here. Judicial estoppel applies only if the previous decision-maker accepted the purportedly estopped argument. *See Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859–60 (Del. 2008). Here, two arbitration panels rejected all the Company's previous arguments. The Company is therefore not judicially estopped.

[178] *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201 (Del. 2008) (emphasis added).

[179] *Levinson v. Del. Comp. Rating Bureau*, 616 A.2d 1182, 1186 (Del. 1992) (internal quotation marks omitted).

[180] *Blinder, Robinson & Co. v. Bruton*, 552 A.2d 466, 474 (Del. 1989).

[181] *AT&T Corp. v. Lillis*, 953 A.2d 241, 257 (Del. 2008).

Another way of thinking about this is that "[j]udicial admissions . . . have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."[182] Thus, a legal argument is not a judicial admission because it does not "prevent the court from . . . applying the facts disclosed by the proof[.]"[183] Put differently, "the scope of a judicial admission . . . is restricted to unequivocal statements as to matters of fact which otherwise would . . . require evidentiary proof[.]"[184] A judicial admission assumes that the fact admitted had not yet been proven.[185]

---

[182] *Itron, Inc. v. Consert Inc.*, 109 A.3d 583, 588 (Del. Ch. 2015) (quoting 2 McCormick on Evidence § 254, Westlaw (8th ed. database) (last updated July 2022)).

[183] *Levinson*, 616 A.2d at 1186 (cleaned up).

[184] *BE & K Eng'g Co. v. RockTenn CP, LLC*, 2014 WL 186835, at *7 (Del. Ch. Jan. 15, 2014) (omission in original) (quoting *Lillis*, 953 A.2d at 257).

[185] *See Ervin v. Vesnaver*, 2000 WL 1211201, at *2 (Del. Super. June 20, 2000) (Quillen, J.) ("Judicial admissions are not a means of evidence but a waiver of all controversy and therefore are a limitation on the issues."); *BE & K Eng'g*, 2014 WL 186835, at *7 (A judicial admission "is an unassailable statement of fact that narrows the triable issues in the case." (internal quotation marks omitted)); Ediberto Roman, *"Your Honor What I Meant to State Was . . .": A Comparative Analysis of the Judicial and Evidentiary Admission Doctrines As Applied to Counsel Statements in Pleadings, Open Court, and Memoranda of Law*, 22 Pepp. L. Rev. 981, 985–89 (1995) (describing nature and effect of judicial admissions and explaining that a judicial admission *is* the truth, because "a fact that is judicially admitted is no longer a fact at issue in the case—the party making the judicial admission has conceded to it"); 6 Handbook of Federal Evidence § 801.26, Westlaw (9th ed. database) (last updated November 2022) ("Judicial admissions are not evidence at all but rather have the effect of withdrawing a fact from contention."); *see also* 4 Williston on Contracts § 8.50 n.12, Westlaw (4th ed. database) (last updated May 2023) ("A stipulation is the functional equivalent of a judicial admission; indeed, the two terms are sometimes used interchangeably. However denominated, it is a statement by which one party waives the right to require the other party to prove a particular fact." (cleaned up)).

The Company contended during arbitration proceedings that Harkonen's conviction was covered by its insurance policies. In doing so, the Company relied on contract interpretation principles to argue that Harkonen's intent did not match the exclusion's terms. The Company's position on Harkonen's intent thus amounted to a legal argument about the plain meaning of its insurance policies. The legal theories of the Company's arbitration counsel are not judicial admissions.

Harkonen contends that the Company's arbitration position on the press release—that it was not false—is a "fact requiring evidentiary proof."[186] But, at that time, there was nothing left to prove. The Company's post-verdict view on the press release cannot be binding as a judicial "admission" of its truth because the press release already had been proven beyond a reasonable doubt to be false.

Collateral estoppel and judicial admissions share analytical roots, particularly concerning the interests of our law in not continuing to litigate admitted and proven facts.[187] Properly understood, Harkonen's position, if accepted, would create a backdoor exception to preclusion. A judicial admission is not a vehicle for reweighing facts found to be true beyond a reasonable doubt by a jury. Otherwise,

---

[186] Dkt. 120 at 24.

[187] *See Bruce E.M. v. Dorothea A.M.*, 455 A.2d 866, 869 (Del. 1983) (analogizing the effect of a judicial admission to "res judicata or collateral estoppel"); *see also Merritt*, 956 A.2d at 1201–02 (Judicial admissions are "traditionally considered conclusive and binding *both* upon the party against whom they operate, and upon the court." (emphasis added)).

48

a subsequent court might reach an inconsistent outcome, thereby unsettling the stability of the verdict. That concern is heightened where, as here, the prior judgment is rendered under federal law—a judgment respected under principles of "federalism, comity, and finality."[188]

Under Section 145, Harkonen's conviction is what matters, not what the Company once thought about it. So Harkonen cannot deploy the Company's arbitration statements to relitigate his intent.[189] Indeed, the arbitrators themselves recognized this sleight-of-hand. The arbitrators observed that the federal courts considered and rejected the parties' arguments and therefore declined to allow them "another trial" on the evidence that established Harkonen's conviction.[190] The Company's motivated "admission" cannot be used to sweep aside a conviction that multiple federal courts, in applying much more onerous standards than those applicable here, found to be supported by overwhelming and convincing evidence.

Finally, Harkonen's argument would open the door to indemnification for a conviction involving a non-indemnifiable state of mind. In that setting, a Delaware corporation cannot even provide insurance through a captive insurance company,

---

[188] *Pyott v. La. Mun. Police Empls.' Ret. Sys.*, 74 A.3d 612, 616 (Del. 2013).

[189] I note that if Harkonen were permitted to relitigate his intent for a fourteenth time, his counsel has represented that he would seek to introduce testimony—live or otherwise—from as many as nineteen witnesses who testified against him approximately fifteen years ago about events that occurred approximately twenty-one years ago.

[190] *See* PX D at 5 (Arb. Order); Ex. B to Dkt. 107 at 49:13–17 (Tr. of Arb. Hr'g).

much less provide indemnification.[191]  Yet, under Harkonen's view, an officer's conviction by a jury of a crime involving bad faith becomes indemnifiable so long as a corporate representative simply states in a later proceeding that, in the corporation's view, the officer's bad-faith conviction is indemnifiable.  Under a less extreme version of that argument, a conviction could become indemnifiable if the Company asserted the officer's innocence strongly enough.  Either way, Section 145(a) does not authorize indemnification of crimes committed with bad faith intent. Harkonen cannot disguise the wolf of indemnification for a willful violation of positive law in the sheep's clothing of a judicial admission.

In sum, the Company is not bound by a judicial admission.[192]  None of Harkonen's arguments escapes his conviction.  The government already proved— and a jury found—the material facts in this case beyond a reasonable doubt.  And although Harkonen disagrees with the facts that proved his guilt, nothing in Section

---

[191] *See* 8 *Del. C.* § 145(g) (prohibiting Delaware corporations from forming a captive insurance company to afford coverage for conduct deemed non-indemnifiable under Section 145(a)); *see also New Enter. Assocs. 14, L.P. v. Rich*, --- A.3d ----, 2023 WL 3195927, at *27–29 (Del. Ch. May 2, 2023) (examining Section 145(g)).  It is also notable that Section 145(g) provides the exact same "deliberate criminal or deliberate fraudulent act" exclusion as the Company's insurance policies.  *See* 8 *Del. C.* § 145(g)(1)(ii).

[192] The Company also has argued that the judicial admission doctrine does not apply here because "admissions are never conclusive and never raise an estoppel except in the suit in which they are made."  *See* Dkt. 104 at 39 (emphasis omitted) (quoting *Rudnick v. Schoenberg*, 122 A. 902, 903 (Del. 1923)).  Harkonen counters that the Company's "same-case" rationale is based on *dicta* and conflicts with other caselaw.  Dkt. 120 at 23.  Given my analysis, I need not decide which argument is correct.

145, precedent interpreting it, or the policy animating it, permits him to redo his prosecution.

## III. CONCLUSION

For the foregoing reasons, the Company's cross motion for summary judgment is granted and Harkonen's cross motion for summary judgment is denied. The parties shall confer on the issues that remain for trial.